ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Lindsay S. Moilanen
Daniel Loss
Ariel Atlas
Alicia Guo
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9083 (Atlas)
212-336-9121 (Guo)
AtlasA@sec.gov
GuoAl@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              Plaintiff,<br><br>          -against-<br><br>ILIT RAZ,<br><br>                              Defendant. | COMPLAINT<br><br>24 Civ. 4466<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Ilit Raz ("Raz"), alleges as follows:

**SUMMARY**

1.      From at least 2018 through June 2023, Raz, the founder and Chief Executive Officer ("CEO") of Joonko Diversity Inc. ("Joonko"), made repeated material misrepresentations to investors about Joonko's business, including its customer base, its technology, and its revenues.

2. Raz marketed Joonko as a technology platform that used artificial intelligence ("AI") to match its customer firms with diverse job candidates from underrepresented backgrounds to help the firms achieve their diversity, equity, and inclusion ("DEI") goals. Raz represented that Joonko had hundreds of paying customers, including Fortune 500 companies, that its annual revenues were increasing, and that hundreds of thousands of active job candidates were using its platform.

3. In reality, these representations were false and misleading. Joonko's platform did not function the way Raz claimed it did. Joonko had at most dozens of paying customers, it lacked any business relationship with many of the Fortune 500 companies that Raz touted, and only a small number of diverse job candidates were actually using its platform to look for work.

4. By early 2023, Raz helped Joonko raise at least $21 million in equity investments from at least 27 investors, including individuals as well as private equity and venture capital firms, based on her fraudulent misrepresentations.

5. Raz also fabricated documents to further her fraudulent scheme. For example, Raz provided investors with fake customer contracts that she forged using names of employees as purported clients. She also created and disseminated to potential investors falsified bank statements and customer lists.

6. In June 2023, Raz's brazen fraud came to light. After refusing to provide investors with access to company documents, members of Joonko's Board of Directors (the "Board") began to investigate. When confronted, Raz ultimately admitted to a representative of the Board that she had lied about the number of customers that Joonko had, the amount of revenue it was generating, and the amount of money in its bank accounts.

7. After Raz's fraud came to light, Raz resigned as CEO and Joonko wound down its business operations. Facing demands by some investors for the repayment of the funds they paid for their shares and lacking sufficient assets to make investors whole, Joonko filed for bankruptcy in May 2024.

## **VIOLATIONS**

8. By virtue of the foregoing conduct and as alleged further herein, Raz violated Securities Act of 1933 ("Securities Act") Section 17(a) [15 U.S.C. § 77q(a)] and Securities Exchange Act of 1934 ("Exchange Act") Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

9. Unless Raz is restrained and enjoined, she will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## **NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT**

10. The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

11. The Commission seeks a final judgment: (a) ordering permanent injunctive relief against Raz; (b) ordering Raz to disgorge all ill-gotten gains she received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)]; (c) ordering Raz to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting Raz from serving as an officer or director of any company that has a class of

securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

12. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

13. Defendant Raz, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

14. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged herein occurred within this District. Joonko's United States headquarters was located in New York, New York, where its employees held meetings with potential investors and conducted other business.

## DEFENDANT

15. **Raz**, age 39, is a citizen and resident of Israel, and was the founder and CEO of Joonko from 2016 until her resignation in June 2023. As CEO, Raz's responsibilities included overseeing the build out of Joonko's platform, business development with customers, and raising money from investors. During the relevant period, Raz also had control over Joonko's bank accounts.

## OTHER RELEVANT ENTITIES

16. **Joonko**, founded in July 2016, is a Delaware corporation with offices in New

York, New York, Tel Aviv, Israel, and at one time, Birmingham, Alabama. Joonko marketed itself as a company that used AI technology to assist its customers in meeting their DEI goals. From at least 2018 through 2022, Joonko engaged in multiple rounds of fundraising in exchange for equity ownership interests in Joonko. On June 15, 2022, Joonko filed a Form D notice of an exempt offering of $17 million equity securities ("Series B Offering").

17. **Investor A** is a large venture capital and private equity firm that invests in technology, software, and internet businesses. In or around June 2022, Investor A invested at least $12 million in Joonko in the Series B Offering.

18. **Investor B** is a venture capital firm that invests in "impact" start-up companies, *i.e.*, start-up companies that pitch themselves as offering market and social equity growth. Investor B invested at least $1.5 million in Joonko from 2017 through 2022.

19. **Investor C** is a venture capital firm that invests in early-stage companies. Investor C invested at least $8 million in Joonko from 2021 through 2022, including in the Series B Offering.

## FACTS

**I.     BACKGROUND**

20. Raz founded Joonko in July 2016, purportedly to help diverse and underrepresented job candidates find employment and assist companies in meeting their DEI goals.

21. Initially, Joonko's stated mission was to use AI and data to identify and solve unconscious gender and racial bias within companies by tapping into their workflow and task management platforms.

22. Later, Joonko purportedly sought to use AI to create a pool of "silver medalist"

job candidates, *i.e.*, underrepresented candidates that made it to the final stages of a company's hiring process but did not ultimately receive a job offer. Using its automated technology, Joonko would purportedly match these underrepresented "silver medalist" candidates with job opportunities at its customer companies to help the customers fulfill their diversity recruitment goals.

23. Joonko's platform claimed to work by:

a. connecting with the applicant tracking systems of companies within the "Joonko ecosystem" to identify pre-qualified candidates and recommend them to other Joonko customers;

b. allowing candidates that got to the final stage interview with a company, but did not ultimately get hired, to be sourced by other Joonko customer companies; and

c. targeting U.S. companies with at least 500 employees and 30 job openings at any given time and gaining diverse candidates through increasing Joonko's customer base.

24. Prior to the 2022 Series B Offering, Joonko conducted multiple rounds of early fundraising in exchange for equity securities. During these fundraises, Raz solicited funds from investors and was investors' primary contact at Joonko.

25. For example, in 2021, Joonko conducted a $10 million Series A fundraise ("Series A Offering"). Based on Raz's solicitation, Investors B and C participated in the Series A Offering by together investing at least $5 million in exchange for preferred stock.

26. On June 15, 2022, Joonko filed a Form D notice of an exempt offering for the Series B Offering of $17 million equity securities, claiming reliance on Rule 506(b) of the

6

federal securities laws.[1]

27. Raz promoted the Series B Offering in or around June 2022 through email blasts to existing investors and potential new investors, and successfully raised at least $17 million for Joonko. As with Joonko's earlier fundraises, Raz was the primary contact for investors during the Series B Offering.

28. For example, based on Raz's solicitation, Investors A and C invested approximately $12 million and $3 million, respectively, in exchange for Joonko Series B preferred stock, voting rights, and seats on Joonko's board.

29. As detailed below, Raz knowingly or recklessly made material misrepresentations to solicit potential investors, including in the Series A Offering and Series B Offering. For example, Raz repeatedly lied about the quantity and quality of Joonko's customer base, fabricated testimonials from fake customers, falsely inflated Joonko's revenue and the number of job candidates using Joonko's platform, misrepresented the technological capabilities and effectiveness of the platform, and tried to conceal her fraud by providing investors with fake bank statements and contracts.

## II.     RAZ'S MATERIAL MISREPRESENTATIONS TO INVESTORS

### A. Material Misrepresentations about Customers

30. To raise funds from investors, Raz repeatedly misrepresented the quantity and quality of Joonko's customers and provided investors with falsified testimonials from fake customers praising Joonko's effectiveness.

---

[1] Rule 506(b) of Regulation D, under the Securities Act, is a safe harbor that allows companies to sell securities without registering those securities, provided they do not engage in general solicitation or advertising to market the securities and the securities are not sold to more than 35 non-accredited investors.

31. Beginning in at least January 2021, Raz regularly emailed investors to boast about Joonko's purported customer base.

32. For example, in February 2021, Raz sent marketing presentations ("Round A Presentation-1" and "Round A Presentation-2") to investors and potential investors, including Investors A, B, and C. These presentations stated that Joonko had more than 120 companies on its platform and highlighted a number of Fortune 500 companies that were supposedly working with Joonko, including Purported Customers A, B, C, and D.

33. As Raz knew or recklessly disregarded, these statements were false. In fact, Joonko had far fewer than 120 customers on its platform, and Purported Customers A, B, C, and D never had business agreements with Joonko.

34. As Raz admitted to Investor A in June 2023, Joonko had no more than 30 companies on its platform, and at least half of the customers Raz reported as Joonko customers were never paying customers.

35. In February 2021, Raz also sent an email to investors and potential investors, including Investor A, stating that "[o]ur pipeline includes more and more F[ortune] 500 companies[.]"

36. As Raz knew or recklessly disregarded, this statement was at minimum misleading because, at the time, Joonko did not have any Fortune 500 companies as customers and there were few, if any, Fortune 500 companies in its pipeline.

37. After receiving the marketing presentations and other information discussed above, Investor A reached out to Raz to learn more about Joonko in late 2021. As their discussions continued, on or around February 28, 2022, Raz provided a new marketing presentation (the "Round B Presentation") to Investor A.

38. The Round B Presentation falsely stated that, in 2021, Joonko had 153 companies on its platform, when it in fact had significantly fewer.

39. The Round B Presentation also included the following fake testimonials:

a. a fake testimonial from Purported Customer A stating, "Joonko has been immeasurably effective in helping our team attract more diverse candidates, by bringing them directly to our recruiters and keeping track of our hiring progress while advancing these candidates";

b. a fake testimonial from Purported Customer C stating, "Diversity is at the heart of our culture and Joonko helped us turn this aspiration to a successful reality"; and

c. a fake testimonial from Purported Customer D stating, "I love the fact that I don't need another dashboard and that relevant candidates are simply flowing into our [Applicant Tracking System], saving me so much time on sourcing. Because of Joonko, I was able to get back to what really matters – hiring great talent."

40. As Raz knew or recklessly disregarded, Purported Customers A, C, and D were not customers of Joonko and did not provide these testimonials.

41. In addition to these marketing presentations, Raz sent potential investors fake customer lists and Joonko bank statements on multiple occasions. For instance, in April 2022, Raz sent emails containing fake customer lists to Investors A and C in response to their due diligence requests. These fake customer lists included, among other Fortune 500 companies, Purported Customers A, B, C, and D.

42. Also in April 2022, Raz provided Investor C a fake Joonko bank statement that had been edited to reflect incoming revenue from fake customers, including Purported Customers A, C, and D.

43. Because of her role as CEO, including her responsibility for business development, her control over Joonko's bank accounts, and her knowledge of the Joonko platform, Raz knew or recklessly disregarded that the customer lists and bank statements she provided to investors were fake.

44. Raz also touted the quantity and quality of Joonko's customer base on public media websites while she was raising money for Joonko. For example, on January 6, 2023, Raz claimed in a public YouTube video that Joonko was now working with over 200 customers and highlighted Purported Customers A, B, and C as Joonko's exemplary customer companies.

45. Raz's public LinkedIn profile as of June 28, 2023 listed several Fortune 500 companies as part of Joonko's customer base.

46. As Raz knew or was reckless in not knowing, including as a result of her responsibility for business development, her statements in the YouTube video and on LinkedIn were false because Joonko had far fewer than 200 customers and its customer base did not include Purported Customers A, B, or C, or the companies listed in Raz's LinkedIn profile.

47. Raz's representations about the quantity and quality of Joonko's customers, as well as the testimonials about customer experience with Joonko's platform, were important to investors, including Investors A, B, and C, in making their investment decisions. At least some investors would not have invested in Joonko had they known these representations were false.

B. **Material Misrepresentations about the Number of Candidates**

48. In an email to Investor B and likely others in November 2019, Joonko stated, with Raz's knowledge, that it had "more than 40,000 candidates in [its] talent pool."

49. As Raz knew or was reckless in not knowing, including from her role in platform build out and business development, Joonko had significantly fewer, if any, candidates on its

platform in 2019.

50. In the Round A Presentation-1 sent to investors in February 2021, Raz claimed in a section titled "US Largest Pool of Qualified Underrepresented Candidates" that Joonko had 102,970 active monthly candidates on the Joonko platform. The slide also included a map with a specific number of candidates on the Joonko platform in each state, including for example, a representation that there were 4,589 candidates in New York.

51. As Raz knew or was reckless in not knowing from her role in platform build out and business development, Joonko had significantly fewer, if any, candidates on its platform in 2021.

52. In the Round B Presentation provided to Investor A and likely others in February 2022, Raz claimed that Joonko had 185,000 active monthly candidates on its platform in 2021.

53. As Raz knew or was reckless in not knowing, including from her role in platform build out and business development, Joonko had significantly fewer, if any, candidates on its platform in 2021.

54. Raz's representations about the number of candidates were important to investors, including Investors A, B, and C, in making their investment decisions.

55. For example, these representations were important to Investor C because Investor C understood that, without enough candidates on the platform looking for work, Joonko could not offer its customers a successful product.

C. **Material Misrepresentations about Revenue**

56. In the Round A Presentation-2 sent to investors in February 2021, Raz falsely claimed that Joonko's annual recurring revenue (money that comes in consistently throughout the year from subscriptions) was projected to increase from $520,000 to over $2 million from the

end of 2020 through the end of 2021. Raz also projected revenue in 2022 to rise to $4.6 million and up to $8.5 million by the second half of 2023.

57. As Raz knew or was reckless in not knowing, including from her access to Joonko's bank accounts and financial information, these projections were false as Joonko's annual recurring revenue in 2020 did not exceed $100,000, and Joonko's existing customer base and pipeline were insufficient to support her projected revenue growth.

58. In an email dated January 17, 2022, Raz told at least Investor A that Joonko had closed $720,000 in sales in the fourth quarter of 2021 and had hit $1.84 million in revenue in 2021.

59. As Raz knew or was reckless in not knowing, including from her access to Joonko's bank accounts and financial information, these numbers were false as neither Joonko's sales nor revenue during 2021 exceeded $100,000.

60. In the Round B Presentation provided to Investor A and likely others in February 2022, Raz claimed Joonko had $2.2 million in annual recurring revenue in 2021, a purported improvement from $250,000 in 2020.

61. As Raz knew or was reckless in not knowing, including from her access to Joonko's bank accounts and financial information, this statement was false because Joonko's annual recurring revenue in 2021 was no more than $100,000.

62. In an email dated April 3, 2022, Raz told at least Investor A that Joonko had closed $1.255 million in sales in the first quarter, hitting over $3 million in annual recurring revenue.

63. As Raz knew or was reckless in not knowing, these statements were false as neither Joonko's sales nor annual recurring revenue during 2022 exceeded $100,000.

64. Also in April 2022, Raz provided Investor C with a falsified bank statement that purported to show large incoming deposits from customers from January 2021 through April 2022, as well as a then-current account balance of $3.7 million and a 2021 account balance as high as $6.8 million.

65. As Raz knew or was reckless in not knowing, including from her access to Joonko's bank accounts and financial information, at least $400,000 of the customer revenue reported on the falsified bank statement was never received, the account had a then-current balance of under $1 million, and the account never had a balance of over $5.6 million.

66. Raz's representations about Joonko's revenue were important to investors, including Investors A, B, and C, in making their investment decisions.

**D. Material Misrepresentations about Joonko's Platform**

67. Raz knowingly or recklessly misled investors about the Joonko platform's use of AI and automation, as well as its ability to connect to customer companies' applicant tracking systems to effectively find diverse and underrepresented candidates for Joonko's customers. For example:

    a. Raz provided electronically to at least Investor B a presentation from May 2019 titled "Joonko Engineering the Future of [DEI]." This presentation claimed that Joonko's technology was based on "seven different AI algorithms."[2]

    b. In marketing materials that Raz emailed to at least Investor B in or around February 2021, Raz claimed that Joonko used "AI-based technology" and described its platform as an "automated recruiting solution."

---

[2] The seven algorithms were identified as: Statistical Analysis, specifically 3-Sigma (variant); NLP, specifically Natural Point of View and Linguistically Informed Model; Machine Learning, specifically K-means, KNN, Perceptron, and Neural Networks.

      c.      In a publicly available interview posted on the website "Unite AI" in March 2023, Raz claimed that Joonko's "proprietary algorithm first uses natural language processing and computer vision to scan public data on the candidates that are referred to us." Raz also claimed that Joonko used "machine learning to improve the matching process as candidates select the roles they're interested in" and that the matching of candidates was "automated from end to end."

68.      Joonko did not actually use these processes. Raz oversaw the build out of the Joonko platform and therefore knew, or recklessly disregarded, that the platform did not work as she described it to investors. For example, Joonko did not have the aforementioned capabilities to connect customers with diverse candidates, and its technology was not as advanced as Raz claimed.

69.      Investors, including Investor B, considered the state of Joonko's technology important in deciding whether to invest.

### III.    RAZ'S FABRICATION OF INFORMATION TO PERPETUATE AND CONCEAL HER SCHEME

70.      As described above, Raz created several marketing materials and email updates with false information over several years in order to continue to raise money for Joonko from new and existing investors.

71.      In one instance, in connection with Investor A's due diligence in early 2022, Raz gave Investor A the names of individuals at companies as references who were not actually customers of Joonko.

72.      In addition, Raz falsified documents, including customer contracts and bank statements.

73.      For example, in 2023, Raz created fake contracts that appeared to be between

Joonko and purported Joonko customers. In creating these fake contracts, Raz used the names of real employees at purported Joonko clients as signatories to the fake contracts. Raz then forged electronic signatures on the contracts with the purported clients' names using the DocuSign function on the Adobe program.

74. In 2023, Raz provided those falsified contracts to investors when confronted with concerns about the company's performance, as described below.

75. In 2022, Raz also created fake bank statements that showed revenue from additional customers by editing Adobe PDF documents that she then provided to investors during their due diligence process, in order to mislead investors about number of customers and current revenue.

### IV.  THE BOARD DISCOVERS RAZ'S FRAUDULENT SCHEME

76. Following the Series B Offering in June 2022, the Board was established and included several Joonko investors.

77. At Board meetings from in or around November 2022 to May 2023, Raz continued to make false and misleading representations regarding Joonko's purported rapid growth in customers and revenue.

78. In early 2023, members of the Board became suspicious of Raz when the Chief Financial Officer of Joonko refused to show Board members certain documents relating to Joonko's finances. As a result, Investor A asked Raz to install a Chief Operating Officer of the Board's choosing so that they could gain greater clarity into the company's bank accounts and customer lists. Investor A also asked Raz to provide updated customer lists, account statements, and customer contracts.

79. In response to this request, Raz provided falsified bank statements and fake

contracts.

80. In June 2023, a representative of Investor A, also on the Board, confronted Raz about the fraudulent documents. During this conversation, Raz admitted that she had forged the bank statements and contracts. She further admitted that she lied about having over 100 customers, and that the number was in fact closer to 30. She also admitted to lying about the amount of revenue that Joonko was generating and the amount of money in Joonko's bank accounts.

81. After discovering the fraudulent conduct, the Board took over operations of Joonko and pressured Raz to resign.

**V.    RAZ PROFITED FROM THE SCHEME**

82. Raz profited substantially from the scheme described above, including through the receipt of cash and stock compensation then worth millions of dollars, and through secondary market sales of hundreds of thousands of her Joonko shares.

83. For instance, on October 24, 2022, Raz signed a secondary stock purchase agreement to sell 1,400,000 shares of Joonko common stock for over two million dollars.

84. By contrast, Joonko's investors suffered substantial pecuniary harm as a result of Raz's fraudulent conduct. Joonko filed for bankruptcy in May 2024 and has insufficient assets to repay investors in full.

**FIRST CLAIM FOR RELIEF**
**(Violations of Securities Act Section 17(a))**

85. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

86. Raz, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate

commerce or the mails, (1) knowingly or recklessly employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

87. By reason of the foregoing, Raz, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### (Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder)

88. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 84.

89. Raz, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly (1) employed one or more devices, schemes, or artifices to defraud, (2) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

90. By reason of the foregoing, Raz, directly or indirectly, singly or in concert, violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

**I.**

Permanently enjoining Raz and her agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Securities Act Section 17(a) [15 U.S.C. § 77q(a)] and Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Raz to disgorge all ill-gotten gains she received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

**III.**

Ordering Raz to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; and

**IV.**

Permanently prohibiting Raz from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**V.**

Granting any other and further relief this Court may deem just and proper.

**JURY DEMAND**

The Commission demands that this case be tried by a jury.

Dated: New York, New York
June 11, 2024

                                                          */s/ Antonia M. Apps*

ANTONIA M. APPS
REGIONAL DIRECTOR
Sheldon L. Pollock
Lindsay S. Moilanen
Daniel Loss
Ariel Atlas
Alicia Guo
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-9083 (Atlas)
212-336-9121 (Guo)
AtlasA@sec.gov
GuoAl@sec.gov